**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **DOREEN MARIE UBLISH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 11 C 4359** |
| **v.** ) | |
| ) | **Magistrate Michael T. Mason** |
| **MICHAEL J. ASTRUE, Commissioner** ) | |
| **of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Claimant, Doreen Ublish ("Ublish" or "claimant"), has brought a motion for

summary judgment [23] seeking judicial review of the final decision of the Commissioner

of Social Security (the "Commissioner").  The Commissioner denied Ublish's claim for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the

Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423(d), and 1382c(a)(3)(A).  The

Commissioner filed a response [28] asking the court to uphold the decision of the

Administrative Law Judge ("ALJ").  The court has jurisdiction to hear this matter pursuant

to 42 U.S.C. §§ 405(g) and 1383(c)(3).  For the reasons set forth below, Ublish's motion

for summary judgment is denied and the decision of the ALJ is affirmed.

**I.     BACKGROUND**

**A.     Procedural History**

Ublish applied for DIB and SSI on July 18, 2008, alleging an onset of disability on

July 16, 2008.  (R. 135-45.)  Her applications were denied initially on October 6, 2008

and upon reconsideration on December 3, 2008.  (R. 75-99.)  Ublish filed a timely

request for a hearing on January 24, 2009.  (R. 102-03.)  On April 21, 2010, Ublish appeared with counsel before ALJ John M. Wood.  Both Ublish and Vocational Expert ("VE") Ronald W. Malik provided testimony at the hearing.  (R. 41-70.)

On June 24, 2010, ALJ Wood issued a written decision finding that Ublish was not disabled under the Act.  (R. 10-24.)  Ublish then filed a timely request for review.  (R. 7-8.)  The Appeals Council denied that request on April 28, 2011 and ALJ Wood's decision became the final decision of the Commissioner.  (R. 1-5.)  Ublish subsequently filed this action in the district court.

### B.    Medical Evidence

#### 1.    Treating Physicians

Ublish seeks DIB and SSI for purportedly disabling limitations stemming from diabetes, fibromyalgia, heart disease, kidney disease, status post heat stroke, and obesity.  Medical records reveal that Ublish has been under the care of various physicians for the past ten years, including Dr. Mario Cote, cardiologist Dr. David Best, and rehabilitative specialist Dr. Thomas Szymke.  Dr. Best first saw Ublish in early 1999 when she was evaluated for chest pain.  (R. 470.)  On March 24, 2000, Ublish underwent outpatient coronary angiography with Dr. Best, which revealed "mild to moderate disease of the left coronary artery and a totally occluded right coronary artery."  (R. 465.)

On March 17, 2003, Ublish saw Dr. Cote, who commented on her history of diabetes and coronary artery disease.  (R. 320.)  On March 30, 2004, Ublish returned to see Dr. Cote and reported high blood pressure and occasional hypoglycemic reactions. (R. 317.)  The following year, on May 24, 2005, Ublish complained of fatigue, occasional tingling in her hands, and fleeting twinges in her chest.  (R. 310.)  Dr. Cote described

these systems as nonspecific, but noted her history of coronary artery disease.  (*Id.*)  An EKG revealed no changes, but further laboratory studies were advised.  (*Id.*)  A physical exam on December 4, 2006 proved primarily unremarkable.  (R. 304.)  On July 13, 2007, Ublish saw Dr. Cote and complained of abdominal pain, thigh discomfort, and chest discomfort.  (R. 301.)  Among other things, Dr. Cote advised Ublish to follow up with her cardiologist.  (*Id.*)

On August 1, 2007, Ublish returned to see cardiologist Dr. Best, whom she had not seen since 2001.  (R. 460.)  She complained of left upper chest discomfort, but explained that she was still able to play softball and lift fifty pound bags of fertilizer at work.  (R. 460.)  Following a physical exam, Dr. Best assessed probable angina pectoris, insulin-dependant diabetes, obesity, hypertension, and known coronary artery disease.  (R. 461-62.)  Ublish declined Dr. Best's suggestion for possible cardiac catheterization due to financial concerns.  (R. 462.)  Chest imaging from March 25, 2008 revealed a "stable chest without evidence of acute cardiopulmonary disease."  (R. 342.)

On July 17, 2008, Ublish was treated in the Emergency Room of Illinois Valley Community Hospital ("Illinois Valley") for heat exhaustion.  (R. 264-65.)  She reported abdominal cramps, muscle cramps, generalized weakness, malaise, and fatigue.  (*Id.*)  Ublish further reported that she had been working outside in very hot temperatures over the past several days.  (*Id.*)  She explained that her blood sugar had been fluctuating erratically.  (*Id.*)  Ublish denied nausea, vomiting, chest pain, or shortness of breath, and her EKG showed no significant abnormalities.  (*Id.*, R. 276.)

The physician on-call diagnosed a history of poorly controlled diabetes and hyperkalemia.  (R. 265.)  During her hospitalization, Ublish also saw her treating

physician, Dr. Cote. (R. 266-67.) He instructed that she avoid outdoor work in high temperatures because of "her underlying vascular-diabetic issues." (R. 267.) After receiving intravenous fluids, Ublish was discharged in stable condition and advised to follow up with Dr. Cote as needed. (R. 265, 289.)

On July 22, 2008, Ublish returned to see Dr. Cote about her heart disease, diabetes, lightheadedness, and malaise. (R. 295.) Dr. Cote noted that working outside in excessive heat was "contraindicated with her underlying medical issues." (*Id.*) He reported that her diabetes appeared improved and he made no changes to her treatment. (*Id.*) Dr. Cote further indicated that Ublish was scheduled for a stress test. (*Id.*)

On August 1, 2008, Ublish underwent a stress test at Illinois Valley. (R. 330.) She exercised for five minutes and thirty-seven seconds and reached eighty-one percent of her age-predicted maximal heart rate. (R. 330, 455.) The stress test showed no evidence of reversible ischemia. (R. 330.) An EKG administered on the same day confirmed only mild aortic stenosis. (R. 332.) Based on these results, Dr. Best concluded that Ublish had no new coronary problems. (R. 459.) He further opined that fluctuations in claimant's blood sugar could be the cause of her cramping, shortness of breath, and fatigue. (R. 458-59.) Ublish followed up with Dr. Best on August 20, 2008 and complained of continued dyspnea and chest discomfort. (R. 455.) Among other things, Dr. Best assessed ischemic heart disease, but commented that her chest discomfort is more consistent with musculoskeletal discomfort. (R. 456.) Ublish again declined Dr. Best's suggestion for cardiac catheterization due to her mounting health bills. (*Id.*)

Ublish met with Dr. Cote on September 10, 2008, complaining of pain in her thighs and legs. (R. 384.) She reported experiencing a dull, achy discomfort that grew worse with activity. (*Id.*) Upon examination, Dr. Cote found that claimant's motor function appeared normal and that her range of motion was only "mildly uncomfortable." (*Id.*) Dr. Cote suggested an EMG with nerve conduction to assess Ublish's lower extremity pain. (*Id.*) Otherwise, he continued treating her diabetes with insulin. (*Id.*)

On September 18, 2008, Ublish consulted with Dr. Thomas Szymke, a specialist in rehabilitative medicine, about the pain in her thighs and legs. (R. 402-04.) Ublish reported she had been suffering from "weak and achy legs" since her bout of heat stroke. (R. 408.) Ublish further reported that her pain was worse with any kind of physical activity and that she could not walk more than 100-150 feet. (*Id.*) According to Ublish, prior to the heat stroke, she could easily work ten-hour days and play competitive fast-pitch softball. (*Id.*)

In a written report to Dr. Cote, Dr. Szymke noted that Ublish had always been extremely athletic and that she was blessed with "gymnastic-level flexibility." (R. 402.) But, by the time of the examination, Dr. Szymke opined that Ublish had lost at least half of her lumbosacral and hamstring motions in just eight weeks. (R. 403.) Dr. Szymke considered it probable that Ublish had significant muscular and fascial inflammation. (*Id.*) While acknowledging that physical activity triggers her pain, Dr. Szymke recommended a program of vigorous stretching, and gave Ublish a set of home exercises. (R. 404).

On October 9, 2008, Ublish followed up with Dr. Szymke. (R. 390-91.) After doing her home exercises, she reported that she experienced angina, persistent back

pain, joint stiffness, and subjective feelings of weakness, all of which significantly limited her mobility.  (R. 391.)  Dr. Szymke hypothesized that there could be a neuropathic component to her pain, which would explain its resistance to treatment.  (*Id.*)

On October 20, 2008, Ublish saw Dr. David J. Coynik regarding widespread staph folliculitis, which he attributed to her diabetes.  (R. 414, 417.)  A week later, on October 27, 2008, Ublish saw Dr. Cote regarding a post-infectious cough with generalized achiness.  (R. 423.)  Dr. Cote noted that Ublish continued to complain of intense weakness and pain in her lower extremities.  (*Id.*)  Dr. Cote further noted that Ublish complained she was unable to stand or sit for more than a short period of time.  (*Id.*)  On physical examination, Dr. Cote found intense tenderness to palpitation of the thigh muscles and some weakness with resistance.  (*Id.*)  Dr. Cote concluded that Ublish was "not able to do any work at this time" and "discouraged her from seeking such."  (*Id.*)  He recommended that she continue with physical therapy and physiatry.  (*Id.*)  He also ordered a chest x-ray.  (*Id.*)

At Dr. Cote's order, Ublish went in for a chest x-ray on October 29, 2008 at Illinois Valley.  (R. 423-24.)  The x-ray showed no evidence of acute cardiopulmonary disease. (R. 424.)  On November 5, 2008, Ublish returned to Dr. Best with complaints of chest pain and shortness of breath.  (R. 481.)  Dr. Best observed that she was fatigued.  (*Id.*) He further commented that Ublish had been unable to work and was pursuing disability. (*Id.*)  Attributing her chest discomfort to angina, Dr. Best recommended cardiac catheterization.  (*Id.*)  Ublish again declined because of cost.  (*Id.*)

On November 24, 2008, Ublish consulted with Dr. Joseph M. Civantos, her ophthalmologist.  (R. 429.)  Ublish had been receiving regular treatment for proliferative

6

diabetic retinopathy from Dr. Civantos since July 2000.  (R. 429-48.)  At her most recent appointment, Dr. Civantos noted that her vision was 20/25 in both eyes.  (R. 429.)  He further reported that her vision was cloudy and that Ublish was seeing some floaters.  (*Id.*)

On December 4, 2008, Dr. Szymke examined Ublish.  (R. 571.)  By that time, Ublish's physical therapist had reported that she had made progress.  (*Id.*)  Her overall pain had subsided and she had improved her ability to complete daily activities.  (*Id.*)  In addition, Dr. Szymke observed that Ublish had increased her range of motion in her lower back and hamstrings.  (*Id.*)  However, she continued to report burning pain in her feet and explained that she could walk only a block and a half before having to stop due to chest pain.  (*Id.*)  Nevertheless, Ublish had increased her activity and was playing guitar at a nightclub where she performed thirty-five minute sets.  (*Id.*)  Dr. Szymke recommended that claimant continue with physical therapy and prescribed Trileptal for her neuropathic pain.  (*Id.*)

On January 8, 2009, Ublish returned to Dr. Szymke for a follow-up appointment.  (R. 573.)  Her treating therapist had recently reported that Ublish was benefitting from aquatic physical therapy, demonstrating improved balance, endurance, and pain relief.  (*Id.*)  However, Ublish told Dr. Szymke that her pain had gotten worse.  (*Id.*)  She had discontinued Trileptal because it was too expensive, and had started Gabapentin.  (*Id.*)  Although Ublish reported some side effects, she stated that the medication had reduced her burning.  (*Id.*)  On physical examination, Dr. Szymke observed that her strength "is really quite functional."  (*Id.*)  Ublish's melancholy demeanor led Dr. Szymke to suggest that she seek treatment for depression.  (*Id.*)

Dr. Szymke saw Ublish again on February 19, 2009, at which time Ublish told Dr. Szymke that she had decided against seeing a mental health professional. (R. 577.) She reported that the Gabapentin had reduced her pain such that she was able to increase her endurance and physical activity. (*Id.*) At the time of the appointment, her most severe pain was in her right lower back. (*Id.*) Dr Szymke found no weakness in Ublish's lower limbs. (*Id.*) He suggested that she continue her therapy, increase her dosage of Gabapentin, and undergo an EMG to diagnose possible neuropathy. (*Id.*)

On March 23, 2009, Dr. Szymke received a progress report from Ublish's physical therapist, Ashley Clark.[1] (R. 582.) Clark reported that Ublish had shown very little improvement since the start of physical therapy. (*Id.*) Clark indicated that Ublish continued to complain of pain and numbness in multiple parts of her body, including her feet, hips, shoulders, and hands, and constant cramping, numbness, and achiness with basic household duties. (*Id.*)

On April 1, 2009, Ublish met with Dr. Cote regarding her generalized pain. (R. 524.) He noted that Ublish had stopped physical therapy because it was not helping. (*Id.*) Dr. Cote reviewed the results of the EMG with nerve conduction, which showed sensory neuropathy, but no evidence of myopathy or denervation. (*Id.*)

Dr. Szymke examined Ublish on May 14, 2009. (R. 583.) Although she had discontinued physical therapy, Ublish reported that she had significantly increased her activity and Dr. Szymke observed that her neuropathic pain seemed to be better controlled. (*Id.*) Specifically, Ublish mentioned that she "was walking as much as four blocks X 2, riding her motorcycle and playing 'pepper' with her former softball

---

[1] This progress report appears to have been inadvertently dated March 23, 2008.

teammates." (*Id.*) Dr. Szymke noted that Ublish complained of "bizarre symptoms" such as splotches on her forearms due to exposure to heat, hand tremors, and a bad cough. (*Id.*) He informed Ublish that it was highly unlikely that her heat stroke had caused these new symptoms. (*Id.*)

Ublish returned to Dr. Cote on May 20, 2009 to discuss her diabetes, shakiness, rash, and painful paresthesias. (R. 523.) Dr. Cote opined that her tremulousness was a side effect of Gabapentin, but noted that Ublish believed that the drug was helping and she wished to continue using it. (*Id.*) Dr. Cote further opined that there was nothing else that could be done to alleviate the pain apart from increasing the dosage of Gabapentin. (*Id.*)

On July 7, 2009, Ublish met with Dr. Robert Eilers of Physical Medicine and Rehabilitation Associates and complained of chronic nerve pain since her episode of heat stroke. (R. 492.) Ublish explained that "she can sit 2 hours and stand 2 hours," as well as "walk about 2 blocks" before she has to stop. (R. 494.) She said she could lift 10-20 pounds at most. (*Id.*) On physical exam, Dr. Eilers found that Ublish tends to move slowly and had difficulty getting up from the seated position. (R. 494-95.) Dr. Eilers assessed myofascial pain secondary to probable dehydration and underlying diabetes. (R. 495-96.) He recommended that Ublish resume physical therapy and prescribed Elavil for her pain. (R. 496.) Dr. Eilers opined that Ublish could not return to her previous heavy work as a commercial operator. (*Id.*) He further opined that "she might be able to find something in a sedentary position," but he doubted whether "there are going to be those types of occupational opportunities available to her." (*Id.*)

On July 20, 2009, Ublish followed up with Dr. Cote regarding her generalized

myofascial pain and heart disease. (R. 522.) Dr. Cote found that her heart disease was asymptomatic and he recommended that she continue the same management. (*Id.*) Regarding her generalized pain, Dr. Cote directed that she continue taking Elavil as instructed by physiatry. (*Id.*)

Ublish's next treatment date occurred on September 2, 2009 with Dr. Best. (R. 509.) Ublish told Dr. Best that she continued to experience chest discomfort and fatigue. (*Id.*) She also explained that she attends tai chi classes, which "seem to help." (*Id.*) Dr. Best made no changes to her medications, and suggested that Ublish follow up in a year. (R. 510.)

Ublish saw Dr. Cote on March 12, 2010 at which time she complained of a burning in her lower extremities and explained that she was unable to stand for long periods. (R. 633.) Dr. Cote noted a full range of motion in all extremities. (R. 634.)

On April 1, 2010, at Dr. Cote's recommendation, Ublish visited the office of rheumatologist Dr. Mark A. Getz about her widespread pain. (R. 625.) She spoke to a nurse practitioner named Kathleen Voelker. (*Id.*) Ublish reported that she experienced the worst pain in her mid-back and hips, followed by her thighs, calves, and shoulders. (*Id.*) On the day of the evaluation, she rated her pain at eight, and fatigue at nine, on a ten-point scale. (*Id.*) However, she noted that the Gabapentin helped take the edge off. (*Id.*) She also said that physical therapy and chiropractic therapy provided some relief, though she had difficulty performing daily activities. (*Id.*) Voelker noted that Ublish had no tender or swollen joints in the upper or lower extremities, and measured her grip strength at 95 percent. (R. 623.) Among other things, Voelker assessed fibromyalgia and advised regular exercise, stress management, and sleep. (R. 622.) Voelker stated

that tai chi, yoga, and chi kung were appropriate activities for fibromyalgia.[2] (*Id.*)

## 2. State Agency Consultants

On September 20, 2008, at the request of the Bureau of Disability Determination Services, Ublish underwent a consultative exam with Dr. Victoria Adeleye. (R. 369-72.) Dr. Adeleye reported that Ublish was diagnosed with diabetes as a child. (R. 369.) Dr. Adeleye further commented on past diagnoses for (1) neuropathy, which causes Ublish tingling, numbness, and pain in her hands and legs; (2) diabetic retinopathy, for which Ublish has received laser therapy and requires surgery on a regular basis; (3) diabetic nephropathy, which is being treated with ACE inhibitors; (4) gastroparesis with occasional symptoms of nausea and vomiting; (5) atherosclerosis with coronary heart disease, which her cardiologist is monitoring; and (6) heat stroke, late-effects of which include fibrosis of the muscles. (R. 369-70.) Ublish also complained of a recent onset of occasional shortness of breath. (R. 370.)

With respect to activities of daily living, Ublish reported she could walk three blocks, stand ten minutes before fatigue sets in, sit for two hours without difficulty, cook a meal provided she takes breaks, and lift, pull, and push twenty-five pounds. (R. 370.) She denied any difficulties getting in and out of the bathtub or dressing herself, but explained that she needs assistance with shopping. (*Id.*)

Dr. Adeleye's physical examination revealed primarily unremarkable results. (R. 371-72.) Dr. Adeleye reported that Ublish could walk greater than fifty-feet without support, that her gait was non-antalgic without the use of assistive devices, and that she

---

[2] The administrative record also includes documentation of two follow-up visits to Voelker and two visits to neurosurgeon Dr. Andrew Tsung for carpal tunnel syndrome. (R. 649-54, 667-77.) However, because the ALJ did not consider these records, they "cannot now be used as a basis for finding reversible error." *Rice v. Barnhart*, 384 F.3d 363, 366 n.2 (7th Cir. 2004).

was able to toe/heel walk.  (R. 371.)  Ublish's ability to grasp and manipulate objects was normal, and she had no significant limitations in her range of motion.  (*Id.*)  Following her examination, Dr. Adeleye assessed the following problems: diabetes, diabetic neuropathy, diabetic retinopathy, diabetic nephropathy, gastroparesis, atherosclerosis, heat stroke, and hyperlipidemia.  (R. 372.)

On October 2, 2008, Dr. Sumanta Mitra conducted a Residual Functional Capacity ("RFC") Assessment.  (R. 374-81.)  Dr. Mitra determined that Ublish could occasionally lift and/or carry twenty pounds, frequently ten pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for six hours.  (R. 375.)  As for postural limitations, Dr. Mitra concluded that Ublish could never climb ladders, ropes, or scaffolds, but made no finding as to her ability to perform the other tasks in this category, such as balancing, stooping, or kneeling.  (R. 376.)  Dr. Mitra found no other environmental, manipulative, visual, or communicative limitations.  (R. 377-78.)  Ultimately, Dr. Mitra opined that Ublish's statements regarding her impairments were only "partially credible in light of the overall evidence" because the limitations that she described exceeded "that supported by the objective medical findings."  (R. 381.)  Dr. Towfig Arjmand affirmed the RFC determination on October 6, 2008.  (R. 425-27.)

### C.    Claimant's Testimony

Ublish appeared at the administrative hearing and testified as follows.  Ublish was born on September 26, 1968.  (R. 44.)  At the time of the hearing, she was 5 feet, 7 and 1/2 inches tall and weighed 265 pounds.  (R. 47.)  Ublish completed high school and a year and a half of college.  (R. 44, 48.)  She is not married, but lives part-time with her long-term girlfriend.  (R. 47.)  She lives in a one-level home that has a basement, but

testified that it has been more than a year since she last went downstairs.  (R. 48.)
Ublish testified that she drives about once a week, and that her mother drove her to the
hearing.  (*Id.*)

Ublish last worked in July of 2008 as a commercial operator for a lawn care
service.  (R. 49.)  In that position, she rode a buggy that fertilized lawns.[3]  (*Id.*)  Ublish
stopped working due to constant pain in her back, arms, shoulders, and legs.  (*Id.*)  She
explained that the pain interferes with her concentration and sleep.  (R. 49.)  Ublish
characterized her sleep as restless and testified that she gets only three to five hours of
sleep per night.  (R. 59.)  She confirmed that she is receiving treatment from a
rheumatologist, but admitted that she met with his nurse on only one occasion.  (R. 49-
50.)  According to Ublish, her primary physician Dr. Cote recommended that she file for
disability.  (R. 50.)

Ublish takes several medications, including Gabapentin, which causes difficulty
with concentration and memory, and Amitriptyline, which affects her balance and makes
her dizzy.  (R. 60.)  The Gabapentin was prescribed to treat her muscle aches and
reduce swelling in her foot and ankles.  (R. 60-61.)  Dr. Cote prescribed the Amitriptyline
to treat her insomnia.  (R. 51.)  Ublish testified that she also takes medications to
manage her diabetes and heart problems.  (R. 60-61.)

When asked what she does on a typical day, Ublish testified that she does very
little because physical activity causes her pain.  (R. 53.)  At times, she watches television
or reads to exercise her eyes, but she can only sit for short periods of time.  (R. 53-54.)
Ublish also said that she walks short distances, lets the dog out, and gets the mail.  (R.

---

[3] Ublish also worked as a dispatcher for the Sherif's department from 1987-1994 and as a chemical stripper
at a metal refinishing company from 1996-2000.  (R. 186.)

53.)  She cooks only simple meals because she cannot bend over to take food out of the oven, nor can she retrieve pans from the pantry.  (R. 53-54.)  Ublish is unable to wash dishes, do laundry, grocery shop, clean, or do yard work.  (*Id.*)

Ublish further testified that she receives help with her personal hygiene.  (R. 52.) Though she can brush her teeth without assistance, her girlfriend helps her get in and out of the shower to bathe.  (*Id.*)  Ublish can dress herself, but sometimes has trouble tying her shoes and fastening buttons.  (R. 52-53.)

Before the heat stroke, Ublish testified that she was a catcher in a women's softball league.  (R. 55.)  However, after the heat stroke, Ublish claimed that her doctor told her to do no physical activity and she testified that she has not "done any physical things."  (R. 54.)  The ALJ then made reference to Dr. Szymke's report of May 2009, in which Dr. Szymke noted that Ublish was walking for exercise, riding a motorcycle, and playing baseball "pepper."  (R. 55.)  The ALJ commented that these activities did not match up with "what you've been telling me here."  (*Id.*)

Ublish confirmed on the record that she had engaged in these activities.  (R. 56.) She then explained that her doctor initially recommended that she increase her activity to improve muscle strength and flexibility.  (*Id.*)  However, she noted that exercise exacerbates her pain such that she has trouble moving the next day.  (*Id.*)  "The more things I do the more pain I'm in," she claimed.  (R. 57.)  Ublish conceded, however, that she still plays the guitar and, at the recommendation of her rheumatologist, practices tai chi at home.  (R. 56-57.)

### D.    Vocational Expert's Testimony

VE Ronald Malik also testified at the hearing.  The ALJ first asked VE Malik to

consider a hypothetical person with the claimant's work experience and the following

limitations: "limited to sedentary work with no climbing of ladders, ropes or scaffolds.

Other postural functions could be performed occasionally. Only occasional overhead

reaching. Other manipulative functions could be performed frequently. Need[s] to avoid

environmental hazards such as unprotected heights and dangerous machinery. The

need to avoid concentrated exposure to all other environmental factors except noise."

(R. 62.) The ALJ then asked if a hypothetical person with such limitations could perform

Ublish's past job. (*Id.*) The VE opined that the individual would be able to return to her

past job as a dispatcher. (R. 63.)

The ALJ then asked the VE to consider whether the same hypothetical individual

could work as a dispatcher if she required an unrestricted sit/stand option. (R. 63.) The

VE testified that such an individual would be able to work as a dispatcher provided that

she does not leave the workstation. (*Id.*) Responding to whether the same hypothetical

individual could work as a dispatcher without unlimited near acuity, the VE explained that

dispatchers require only frequent near acuity and frequent accommodation. (*Id.*) The

ALJ next asked whether someone who is limited to performing simple and repetitive

tasks could hold a skilled position, such as a dispatcher. (R. 63.) The VE responded in

the negative. (*Id.*)

Next, the ALJ asked what unskilled positions the hypothetical individual with all of

the aforementioned limitations could perform assuming that person is of the claimant's

age, education, and work history. (R. 63.) The VE stated that the individual could

perform work as a document preparation clerk (2,200 positions), finish assembler (2,700

positions), and screener or touch-up worker (2,700 positions). (*Id.*) The ALJ asked how

15

many absences per month an employer would tolerate at these positions.  (*Id.*)  The VE opined that a person who misses two or more days per month would not retain employment in such positions.  (R. 65.)

Finally, the ALJ asked whether there would be any change if the hypothetical person could have only occasional interaction with the public, coworkers, and supervisors.  (R. 67.)  The VE said it would not affect the unskilled sedentary positions, but would eliminate the dispatcher position.  (*Id.*)

## II.     LEGAL ANALYSIS

### A.     Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L. Ed. 2d 842 (1971)).  Our review is deferential and we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner."  *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues."  *Id.*  Although the ALJ "must build an accurate and logical bridge from the evidence to his conclusion," he need not discuss every piece of evidence in the record.  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  Nonetheless, the ALJ must

"sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

**B.      Analysis under the Social Security Act**

Whether the claimant qualifies for disability insurance benefits depends on whether the claimant is "disabled" under the Act.  A person is disabled under the Act if he or she has "an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

To determine whether a claimant is disabled, the ALJ must perform the following five-step inquiry to determine: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in the national economy."  *Dixon*, 270 F.3d at 1176.  The claimant has the burden of establishing a disability at steps one through four.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).  If the claimant reaches step five, the burden shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy."  *Id.* at 886.

ALJ Wood applied this five-step inquiry.  At step one, the ALJ found that Ublish has not engaged in any substantial gainful activity since the alleged onset date of July

17

16, 2008.  (R. 15.)  At step two, the ALJ found that Ublish has the following severe impairments: "diabetes mellitus, fibromyalgia, coronary artery disease (CAD), kidney disease, status post heat stroke episode and obesity." (*Id.*)  At step three, the ALJ determined that although Ublish suffers from severe impairments, she does not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

Next, the ALJ found that Ublish retains the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) with certain restrictions.  (R. 17.) Specifically, the ALJ found that Ublish required work that allows for a sit/stand option at will; she can never climb ladders, ropes, or scaffolds; she can occasionally perform all other postural functions and can frequently engage in manipulative functions; she must avoid all hazards, such as machinery and unprotected heights, and avoid concentrated exposure to extreme temperatures, wetness, humidity, pulmonary irritants, and all other environmental factors except noise.  (*Id.*)  The ALJ also determined that Ublish cannot perform work that requires unlimited near acuity and is limited to simple, routine, and repetitive tasks.  (*Id.*)  Based on this RFC assessment, the ALJ concluded at step four that Ublish is unable to perform any past relevant work.  (R. 23.)

Lastly, at step five, the ALJ determined that Ublish could perform a significant number of jobs at the sedentary level of exertion including finish assembler, document preparation clerk, and screener/touch-up worker.  (R. 24.)  Based on this finding, the ALJ found that Ublish was not disabled under the Act.  (*Id.*)

Ublish now argues that the ALJ erred because he did not resolve inconsistencies regarding her date last insured.  She further contends that the ALJ's credibility

18

determination is patently wrong because he included boilerplate language and failed to indicate which of Ublish's statements were inconsistent with the RFC.  Finally, Ublish argues that the ALJ's RFC determination is flawed because he failed to perform a function-by-function analysis of her ability to perform work-related activities.  We address these issues in turn below.

### C. The ALJ's Misstatement of Claimant's DLI is Harmless Error and does not Warrant Remand.

Ublish first argues that the ALJ's misstatement of her date last insured ("DLI") is grounds for reversal.  The DLI marks the last day on which a claimant is eligible for disability insurance benefits, and the claimant must establish disability on or before that date.  *See* 42 U.S.C. § 423(a)(1)(A); 20 C.F.R. § 404.320(b)(2); *Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011) (the claimant "had social security disability coverage only until the end of 2003; if she was not disabled by then, she cannot obtain benefits even if she is disabled now").  Here, ALJ Wood appears to have incorrectly identified the DLI as December 31, 2012, instead of December 31, 2013.  While the Commissioner concedes that the ALJ misstated the DLI, he argues that the error was harmless and does not warrant remand.  We agree.

In no way did ALJ Wood's error here circumscribe his review of the medical evidence because he considered the entire record through June 24, 2010, the date of his decision.  Under such circumstances, we are guided by the court's reasoning in *Tyler v. Astrue*, No. 10–599, 2012 WL 4497418 (D. Del. Sept. 28, 2012).  There, the ALJ misidentified the DLI as June 30, 2009, when in fact it was June 30, 2010.  *Id.* at *10.  However, because "none of the evidence in the medical record post-dated the incorrect DLI," the court found that the error was harmless and remand was unnecessary.  *Id.* at

*10.

Similarly, in the instant case, the ALJ accounted for the entire record up through the decision date and excluded no evidence on account of the erroneous DLI. (R. 13.) As a result, this error does not require remand.

### D.    The ALJ's Credibility Determination was Not Patently Wrong.

The claimant also takes issue with the ALJ's credibility assessment. It is well settled that the court must afford the ALJ's credibility finding special deference because the ALJ is "in the best position to see and hear the witnesses and assess their forthrightness." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Consequently, we will reverse a credibility determination only if it is "patently wrong." *Zurawski*, 245 F.3d at 887. To be patently wrong, an ALJ's determination must lack "any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

In assessing the credibility of the claimant's allegations of pain and limitations, the ALJ must consider (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. Social Security Regulation ("SSR") 96-7p, 1996 WL 374186, at *3.

Ublish correctly points out that ALJ Wood used the boilerplate statement that has

20

recently been criticized by the Seventh Circuit. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012); *Bjornson v. Astrue*, 671 F.3d 640, 644–45 (7th Cir. 2012). However, the use of this language alone does not require remand. Instead, as the Commissioner acknowledges, we must assess whether the ALJ has accompanied that language with a well-reasoned analysis. *See Dampeer v. Astrue*, 826 F. Supp. 2d 1073, 1084-85 (N.D. Ill. 2011) ("Boilerplate language taken in isolation may not be permissible, but in this case it is given context by a reasoned analysis.").

Here, along with the boilerplate language, ALJ Wood offered a well-reasoned explanation of his credibility assessment. First, the ALJ commented on the lack of objective evidence to substantiate Ublish's claims of pain and limitations. Among other things, he noted the absence of MRIs, x-rays, or CT scans to establish the etiology of the pain in Ublish's back, shoulders, arms, and legs. (R. 20-21.) Although the absence of objective medical evidence is by itself not enough to discredit a claimant's testimony, a discrepancy between the reported pain and the medical evidence can indeed be "probative that a witness may be exaggerating her condition." *Powers*, 207 F.3d at 435-36.

ALJ Wood also pointed to specific inconsistencies between Ublish's testimony and her previous statements to her doctors. For example, Ublish testified at the hearing that "she is incapable of performing very basic activities of daily living, like personal hygiene and dressing herself," and that "she has very little energy and can barely walk or function, barely dress herself and can only brush her teeth without help." (R. 21-22.) She further testified that she has done very little since suffering a heat stroke in July of 2008. This testimony is in direct contrast to what she told Dr. Szymke in May 2009. At

that time, Ublish reported she could walk four blocks, had ridden a motorcycle, and played "pepper" with her former softball teammates.  It was proper for the ALJ to rely on such inconsistent statements when assessing the claimant's credibility.  *See Elder,* 529 F.3d at 414 ("It is well within the ALJ's authority to disregard Elder's testimony because it conflicted with what she told Dr. Ko.").  As for Ublish's daily activities, ALJ Wood noted that despite her purported need for frequent assistance, her girlfriend only lives with her part time.  Because ALJ Wood's credibility assessment was properly articulated and supported, it was not patently wrong.

### E.   The ALJ's RFC Assessment was Properly Articulated and Supported by Substantial Evidence.

Ublish also takes issue with ALJ Wood's RFC assessment, arguing that the ALJ failed to consider the aggregate effect of her impairments, failed to consider all of the medical evidence, and improperly "played doctor."  We disagree.

"The RFC is the maximum that a claimant can still do despite his mental and physical limitations."  *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008); 20 C.F.R. § 404.1545(a)(1); SSR 96-8p.  "It is based upon the medical evidence in the record and other evidence, such as testimony by the claimant or his friends and family."  *Craft*, 539 F.3d at 676; 20 C.F.R. § 404.1545(a)(3).  Pursuant to SSR 96-8p, the "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  As the Seventh Circuit has explained, "[a]lthough the RFC assessment is a function-by-function assessment, the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient."  *Knox v. Astrue*, 327

Fed. Appx. 652, 657 (7th Cir. 2009) (internal quotation omitted).

As an initial matter, we disagree that the ALJ failed to consider the aggregate effect of claimant's impairments and note that claimant makes little more than conclusory arguments in support of this assertion. With respect to the ALJ's articulation of his RFC assessment, we conclude that the ALJ properly considered the medical records, the opinions of various physicians, and the claimant's testimony in compliance with SSR-96-8p. ALJ Wood first commented, albeit briefly, that he found the opinions of the state agency physicians that Ublish could work at the light level to be reliable. However, after a thorough review of the medical records and the claimant's own allegations, he concluded that Ublish could work at the sedentary level with additional specified restrictions. Among other things, the ALJ specifically addressed Ublish's treatment history, the effectiveness of various treatment, and the dearth of records regarding the extreme limitations to which Ublish testified. In doing so, we are able to trace his reasoning as to how the medical evidence, or rather lack thereof in some instances, supports his RFC assessment. We also note that Ublish cites to no other treating source opinions or medical records evidencing her purportedly disabling limitations. *See* 20 C.F.R. § 404.1512(c) ("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled.").

Additionally, ALJ Wood sufficiently explained why he rejected Dr. Eiler's conclusion that Ublish would be unlikely to engage in any work. *See Denton v. Astrue*, 596 F. 3d 419, 424 (7th Cir. 2010) ("the ALJ is not required to give controlling weight to the ultimate conclusion of disability—a finding specifically reserved for the Commissioner."). As for playing doctor, an ALJ does not do so where, as here, his

"determinations are supported by the record evidence and testimony." *Lott v. Astrue*, No. 11 CV 5632, 2012 WL 5995736, at *8 (N.D. Ill. Nov. 30, 2012). Lastly, and as discussed above, the ALJ properly handled the assessment of Ublish's credibility. We find no reversible error in the ALJ's RFC assessment.

## III. CONCLUSION

For the reasons set forth above, we conclude that the ALJ's decision was supported by substantial evidence and free from legal error. Claimant's motion for summary judgment is denied and the decision of the ALJ is affirmed. It is so ordered.


**ENTERED:**

_____
**MICHAEL T. MASON**
**United States Magistrate Judge**


**Dated:      January 7, 2013**